Opinion by
 

 Cunningham, J.,
 

 The appeal in this workmen’s compensation case is by the employer from a judgment entered against it and its
 
 *238
 
 insurance carrier, on January 24, 1938, upon an award to the claimant of compensation, at the rate of $15 per week for a period of 215 weeks, for the permanent loss of the use of her left leg, subject to a credit of $92.14 paid her as compensation for total disability for 6-2/7th weeks under an open agreement. The award was made under Section 306(c) of the Workmen’s Compensation Act of June 2, 1915, P. L. 736, as amended April 13, 1927, P. L. 186, 77 PS §513.
 

 The case has had a long and unnecessarily involved history. Most of the difficulties were, and still are, due to the failure of the compensation authorities to apprehend the issues involved and make the specific underlying findings essential to enable the courts to decide the rather close questions of law raised by the appeal. The award was based upon two ultimate and general conclusions : First, that a final receipt mailed to the claimant, signed by her in her own home and returned by mail to the insurance carrier, was founded upon a mistake of fact within the meaning of Section 434, as amended June 26, 1919, P. L. 642, 77 PS §1001, and, could, therefore, be set aside more than one year after its date; and second, that the admittedly accidental injury to claimant’s left knee has resulted in the “permanent loss of the use” of her leg, within the intendment of paragraph (c) of Section 306, supra. Manifestly, these final conclusions require the support of a number of underlying and specific findings of fact. Unfortunately, we are unable to find in the record any specific findings upon certain controlling questions of fact, which must be made one way or the other before the law can properly be applied.
 

 One of the fortunate features of the case, however, is that the claimant has been paid full compensation for each week her disability prevented her from working and ever since her return to work has been paid the same wages she was receiving prior to the accident. As the
 
 *239
 
 evidence discloses she has not been able to render all the services she was performing at the time of the accident and has required the assistance of a fellow worker— in other words, has not been fully
 
 earning
 
 her wages— the fact that her employer has seen fit to pay her full wages since her return to work does not estop her from claiming (within the limitations of the statute) compensation for diminution in earning power, under paragraph (b) of Section 306, or for the loss of the use of a member, under paragraph (c) of that section. This feature of the case is controlled by our decision in
 
 Plum v. Hotel Washington et al.,
 
 125 Pa. Superior Ct. 280, 189 A. 792, rather than in
 
 Sayre v. Textile Machine Works,
 
 129 Pa. Superior Ct. 520, 195 A. 786.
 

 A review of the history of the case will indicate the ¡difficulties with which we are now confronted. For ten years prior to the date of the accident, August 24,1931, claimant, sixty-one years of age, had been employed by the county of Allegheny as a “comparer” in the transcribing department of the office of the recorder of deeds, located in the City-County Building. On that morning, when stepping off the elevator, she slipped and fell on a wet floor, injuring her left knee. Her wages had for some time been $33.40 per week. Upon her removal to Mercy Hospital she was treated by Dr. H. C. Kuehner. After her discharge from the hospital on September 19, 1931, she was attended by him at her home, and after her return to work made frequent visits to his office.
 

 On September 25, 1931, an open agreement was executed for compensation for total disability at the rate of $15 per week, beginning August 31, 1931. Under this agreement she was paid compensation up to October 14th of that year — a period of 6-2/7th weeks and a total amount of $92.14. On that date she signed a “Final Settlement Receipt” in which she stated she “was able to return to work on the thirteenth day of October, 1931, at a wage of $33.40 per week.” She made no claim for
 
 *240
 
 nearly two years after her return to work for compensation in addition to her wages.
 

 The present controversy had its origin in the filing by claimant on October 4, 1933, of a petition to set aside the final receipt upon a ground thus stated by her: “At the time the final receipt was signed I was disabled and I am still disabled. The extent of my injury has never been determined. Final receipt was signed under mistake.”
 

 No effort was made in the petition to describe the nature of the alleged mistake, nor did claimant indicate that her then existing disability was anything more than a partial disability, within the meaning of paragraph (b) of Section 306. An answer was filed denying claimant had any disability and averring that the receipt was not founded upon any mistake existing at the time it was signed. When the matter came before a referee, it was stipulated on the record that there had been no loss of wages since the signing of the receipt. The claimant testified generally that she thought when she signed the receipt her knee “was going to get better”; that Dr. Kuehner had not yet discharged her; that her leg was very painful; that it was necessary for her to wear a bandage and rubber knee cap and use a cane; that she was not able to stand for any length of time; and because she was obliged to keep her leg propped up on a waste basket beside her desk it was necessary for one of her fellow workers to assist her by bringing the books on which they were working to her desk and returning them to the racks. There was nothing in this evidence indicating that claimant at the time of the hearing was suffering from anything more than a partial disability. At its conclusion, counsel for the insurance carrier moved that the petition be dismissed “for the reason that it was filed more than one year after the taking of the final receipt and was, therefore, barred by the statute of limitations.” This motion raised one of the control
 
 *241
 
 ling questions in the case, namely, whether the then condition of claimant’s knee was the result of physical changes which had occurred since the agreement was terminated by the final receipt, or whether there had been no change during that period. If the former, the petition, regardless of its title, should have been considered as a petition under the second paragraph of Section 413, as amended April 13, 1927, P. L. 186, 77 PS §772, for relief by reason of an increase in disability. In that event it would fall within the principles stated in the case of
 
 Borneman v. H. C. Frick Coke Co.,
 
 122 Pa. Superior Ct. 391, 186 A. 223, and should have been dismissed upon the ground that it had not been filed within one year after the last payment of compensation under the agreement. On the other hand, if no change had taken place in the physical condition of the knee, the case might fall within the scope of
 
 Johnson v. Jeddo Highland Coal Co.,
 
 99 Pa. Superior Ct. 94.
 

 If the receipt was actually founded upon a mistake, the board had jurisdiction to entertain the petition to set it aside, as it was filed not only within the 300 weeks’ period but also within the definite period of 215 weeks specified for the loss of a leg. The theory upon which a conclusion of mistake might be sustained, under sufficient evidence, would be that the parties were mutually mistaken with respect to the condition of claimant’s knee when the receipt was signed, and it was, therefore, not based upon a mere mistaken belief upon her part that her knee would get better. Such cases as
 
 Reichner v. Blakiston’s Son & Co. et al.,
 
 115 Pa. Superior Ct. 415, 175 A. 872, where there was clearly a recurrence of disability, and
 
 Reddicks v. Welsbach G. & E. Co. et al.,
 
 124 Pa. Superior Ct. 285, 188 A. 417, would not be applicable. They announce the principle that a mere mistaken belief that an employee may return to work without danger of any recurrence of disability is not the kind of mistake of fact which is contemplated by Section 434.
 
 *242
 
 No specific findings upon the underlying facts of this branch of the case appear in the record, but in the course of the opinion of the board affirming the award these general statements were made: “We are also of the opinion that there is sufficient testimony showing that the final receipt was signed under a mistake of fact. The testimony in this case shows that the condition of the claimant’s leg did not increase after the signing of the final receipt, but that it remained in the same condition; that when she signed the final receipt she was walking with crutches; that she was unable to use this leg; that she could not do her work as well as she did prior to the accident, although she was paid the same weekly wage.”
 

 Some of these statements are not supported by the evidence. The statement that claimant was walking with crutches when she signed the final receipt is clearly erroneous; there is testimony that she was using a cane, but none that she used crutches. It is by no means clear that the statement of the board that “the condition of claimant’s leg did not increase after the signing of the final receipt” is supported by the medical testimony now upon the record. The testimony of Dr. Kuehner, relative to the condition of the knee immediately after the accident, reads: “The knee, however, showed a very marked narrowing of the joint space on the middle side. There was a definite effusion into the joint, with marked tenderness and pain on manipulation, limitation of function, and muscle spasm.” His testimony, with respect to its condition at the date of the last hearing, September 6, 1935, reads: “At my examination today I find that there is still the definite evidence of traumatic arthritis with pannus formation, weakness in the knee, disturbance of the local, normal anatomical landmarks, marked crepitation on manipulation of the joint, as has been observed in the interval since her discharge from the hospital.” On cross-examination, when asked
 
 *243
 
 whether the condition of the knee had “gotten progressively worse” since claimant’s discharge from the hospital in September, 1931, his reply was: “A. I think the changes in the joint have probably increased in the last year; that is, the pannus formation, which is the inflammatory reaction to a continued irritation; and there is probably a little increased change in the contour of the joint in the last year. The functional change is about the same — that is, the limitation — inability to use it for long periods — pretty much the same. Q. In other words, probably the traumatic arthritis has increased since around a month or two months after the discharge from the hospital? A. The proliferative tissue changed. Those things are gradual. Q. If that arthritis increased, it would increase to a certain extent the functional disability of the knee?......A. Yes.” The proper disposition of this case requires a specific finding one way or the other by the fact-finding body upon the issue whether there had been a change in the physical condition of claimant’s knee between the date of the receipt and the filing of her petition to set it aside. As above indicated, the board’s jurisdiction, or lack thereof, depends upon the answer to that inquiry.
 

 Eeturning to the history of the case, the record shows that the first referee, without affording the parties an opportunity to submit any medical testimony, summarily dismissed the petition upon the ground that it was barred by the limitation of one year in the second paragraph of Section 413. Upon claimant’s appeal to the board, it was held, in an opinion under date of January 3, 1935, that the referee had erred in applying section 413 instead of Section 434 in disposing of the petition. The board further held the testimony did not, in its opinion, “disclose such a mistake of fact as is contemplated by Section 434,” nor did the record contain any evidence that there had been any loss of earning power. Claimant’s appeal was accordingly dismissed on its
 
 *244
 
 merits. She then appealed to the common pleas at No. 1563, April Term, 1935. While her appeal was pending before the court, claimant, on May 25, 1935, filed a petition with the board, under Section 426 of the statute, as amended April 13, 1927, P. L. 186, 77 PS §871, for a rehearing for the purpose of submitting testimony relative to the extent of her disability, etc. This petition was granted and the record remitted to another referee, before whom additional testimony by claimant and the testimony of one of her fellow workers and Dr. Kuehner was taken on September 6, 1935. On October 22, 1935, the referee made the award which became the basis of the judgment in this case.
 

 The eleventh finding of fact of the referee reads: “Prom the additional medical testimony produced and the testimony of other witnesses, your referee believes and finds as a fact that the claimant has sustained the industrial loss of left leg.” This referee, however, neglected to make any finding on the issue of mistake.
 

 Upon the employer’s appeal to the board it was held, in an opinion under date of July 9, 1936, that the testimony at the last hearing was “sufficient to show that the claimant has lost the use of her one limb,” but the record was returned to the referee to afford the claimant an “opportunity to prove the circumstances transpiring at the time the final receipt was signed” and then make a finding upon the question whether it was founded upon a mistake. Prom this order the employer appealed to the common pleas at No. 476 October Term, 1936. A question arose with respect to whether the appeal from the referee’s award to the board had been taken in time. The decree of the court below holding it had been, was affirmed by this court in
 
 Conley v. Allegheny County et al.,
 
 124 Pa. Superior Ct. 303, 188 A. 385. The record was accordingly returned to the referee for a rehearing at which the claimant testified she had not consulted Dr. Kuehner, or any other person, before signing the
 
 *245
 
 receipt and did not know she had any permanent disability until she heard the doctor testify to that effect at the hearing on September 6, 1935. The referee made a finding reading :
 

 “From the additional testimony produced by other witnesses, your referee believes and finds as a fact that the claimant has sustained the industrial loss of the use of the left leg and that the claimant signed the said final receipt under a mistake of fact.”
 

 A formal award was entered against the employer and its insurance carrier under Section 306(c). The board, upon the appeal of the employer and its carrier, affirmed the findings of fact and conclusions of law of the referee. Upon the employer’s appeal to the court below at No. 1718 January Term, 1938, that tribunal, in an opinion filed January 24, 1938, dismissed the exceptions and entered judgment upon the award. The present appeal is from that judgment.
 

 Here, again, we have only the general conclusion of the compensation authorities that “the claimant has sustained the industrial loss of the use of her left leg.” It is not supported by any subordinate findings, nor is it, in our opinion, supported by the evidence now upon this record. We have no means of knowing what circumstances the compensation authorities considered as amounting to the “permanent loss of the use” of a member.
 

 The word “industrial,” as modifying the word “use,” does not appear in Section 306(c). As applicable to the present case, the language of the section is: “For the loss of a leg sixty-five per centum of wages during 215 weeks .......amputation at or above the knee shall be considered as the loss of a leg. Permanent loss of the use of a......leg......shall be considered as the equivalent of the loss of such......leg......” No attention seems to have been given by the compensation authorities, or the court below, to the decisions con
 
 *246
 
 struing the phrase “permanent loss.” In
 
 Kerwin v. American Ry. Exp. Co.,
 
 273 Pa. 134, 116 A. 655, the claimant, a truck driver and required to handle boxes and packages in loading and unloading shipments of goods, suffered such an injury to his right arm at the shoulder joint that “the scope of motion in the shoulder was but ten per cent of normal,” and it was conceded that he was “not able to pursue the occupation he followed at the time of receiving injury or perform other manual work requiring the use of his arm.” Our Supreme Court held that the fact he might be able to earn at some other occupation, requiring but slight use of his arm, as much as, or more than, he was earning at the time of the injury, would not deprive him of the right to compensation for the loss of the use of the arm. By way of illustration, it was pointed out that if an injury results in amputation of a member, compensation for such loss cannot be avoided by showing the victim’s ability to earn as much in another occupation not requiring the use of the missing member. In
 
 Lente v. Luci,
 
 275 Pa. 217, 223, 119 A. 132, reference is made to
 
 Pater v. Superior Steel Co.,
 
 263 Pa. 244, 106 A. 202, where an infection from an injury set in at the point of amputation below the elbow, but extended above the joint and disabled the entire arm. In considering the phrase, “a permanent injury” the Supreme Court said: “A member does not necessarily need to be amputated for the injury to cause total loss, as, for instance, the foregoing illustration, or an arm crushed, hanging permanently useless at the side. A permanent injury must be one that destroys the usefulness of the member.” In
 
 Sharcheck v. Beaver Run Coal Co.,
 
 275 Pa. 225, 119 A. 135, we have an illustration of the loss of the use of a foot by a miner. The X-ray plate showed a disease of the tibia, with the loss of bone substance, which had progressed sufficiently to involve the cartilage in the joint interfering with motion at the ankle and resulting
 
 *247
 
 in inability to move the foot backward or forward, or to the side. It was held that the evidence in that case showed the loss of the use of the foot for the work in which claimant was engaged at the time of the injury.
 

 There are two cases decided by this court bearing upon the construction of the portion of the section with which we are now concerned. The first is
 
 Hager v. Maryland Casualty Co. et al.,
 
 87 Pa. Superior Ct. 159, in which the claimant, while employed in cutting asbestos covering with a circular saw, lost a thumb and portions of several fingers with the effect, as described in the opinion, that the hand had “only a hooking function, and the scarring in the palm and on the index finger impair the grasping power of bringing the fingers into the palm of the hand.” After endeavoring to work at a number of occupations, the claimant found he could not use what remained of his hand in any occupation for which he was fitted. A finding that he had “sustained the loss of the use of the hand” was sustained in this case. On the other side of the line,
 
 Gorman v. American Metal Co. et al.,
 
 87 Pa. Superior Ct. 532, is an illustration. There, the claimant, a punch press operator, sustained, as the result of an accident, the amputation of portions of three fingers. The compensation authorities found he had lost the use of the hand and the court below entered judgment on the award. In reversing, this court said, page 535, “It is not sufficient to entitle the party to the compensation claimed that he has lost the use of his hand for the particular employment in which he was engaged ; the use must have been lost for all practical purposes.” Reference was made in the opinion to
 
 Chovic v. Pittsburgh C. S. Co.,
 
 71 Pa. Superior Ct. 350, where it was said: “Whether a man has lost the use of a hand depends upon whether the hand has become useless in any employment for which that particular man is mentally and physically qualified.” It is also indicated that an award under Section 306(c) cannot be sustained by
 
 *248
 
 merely showing that a claimant labors under a “handicap” as a result of an injury, because “every partial disability presumably causes a diminution of industrial capacity.”
 

 When we examine the evidence in this case, we find Dr. Kuehner testifying: “Q. And would you state whether her (claimant’s) power or capacity to earn has been diminished as a result of the injury, and to what extent, if any? A. The disability in this patient is confined to the injured knee.......So far as the knee is concerned, I think for any
 
 continued
 
 or
 
 heavy use
 
 it is definitely disabled. Q. To what extent is the knee disabled as far as heavy use is concerned, doctor?” Upon objection being made to this question, a discussion between the referee and counsel ensued; at its conclusion the record continues: “By the referee: Why not just ask the question how much this disability of hers — ■ whether it prevents her from doing this type of work or any type of work or how much work she can do?...... A. I feel that so far as work is concerned, this woman is inhibited from doing any form of work which would require the
 
 continued use
 
 of the knee — for ordinary standing purposes, for the ascending or the descending of stairs, for the lifting repeatedly of objects, or for any procedure requiring
 
 prolonged walldng;
 
 in other words, so far as the knee is concerned, I feel that she is almost necessarily confined to some occupation that will permit the
 
 frequent removal of the superimposed weight from the Jmee.
 
 By the referee: Q. In other words, some position where she may be able to sit down all the time? A. That is right. By Mr. Catanzaro: (Counsel for claimant) Q. This condition, doctor, is it permanent or is it just temporary? A. I think that with the time that has elapsed and all factors that are concerned in the case it is unquestionably a permanent condition. Q. Do you believe that there is reduction in the claimant’s earning power as a result of the condition of the
 
 *249
 
 leg? A. From the standpoint of a sound physical being there is unquestionably reduction in the earning power.” (Italics supplied)
 

 The next inquiry of the witness was with respect to the percentage of disability. After a discussion in which counsel for the employer objected to the question in the absence of any showing that the witness had “knowledge of industrial conditions such as this claimant is capable of engaging in,” etc., the witness was permitted to answer and the record continues: “A. I think the only accurate estimate that may be drawn to answer that question would be to state that, based on my knowledge of this ease and comparing it with any other similar cases that I have seen, the fairest estimate would be that the disability corresponds to a loss of the
 
 use of the leg for industrial purposes.
 
 I don’t know whether that gives you a percentage estimate or not. By the referee: That gives a total percentage.” (Italics supplied)
 

 It is apparent that both the referee and the witness have here confused two separate and distinct matters arising under separate paragraphs of the statute; one, the anatomical condition of the leg, under the language of Section 306(c), the other, percentages of disability attributable to partial disability, under Section 306(b). If a claimant has suffered the amputation of a leg, or if it has become permanently and wholly useless in any employment for which the claimant is mentally and physically qualified, the extent of the consequent disability is immaterial, because, as stated in the syllabus of
 
 Lente v. Luci,
 
 supra, Section 306(c) fixes the amount to be paid for such a loss “without considering, but including, all incapacity, whether such incapacity were total, partial, or no incapacity at all.”
 

 Expert testimony was competent and necessary to establish the anatomical condition of claimant’s knee, but the question whether the condition shown amounted
 
 *250
 
 to the “permanent loss of the use” of claimant’s leg depended, as we have above indicated, upon many other facts, outside of the realm of the expert knowledge of the witness, and upon the proper application of established principles of law to all the relevant facts.
 

 The expression of an opinion by any witness, lay or expert, that the use of a leg has been lost is of little value in the face of uncontroverted evidence that the leg has
 
 actually been used
 
 constantly during the preceding four years, though not with the ease and freedom enjoyed prior to the injury.
 

 In the administration of justice as between employer and employee under our statute it is essential that awards have a realistic and common sense basis. It is a compensation and not a bonus act.
 

 There is some indication on this record that the award may have been based upon another rather prevalent misconception upon the part of the compensation authorities with respect to the relevancy and competency of a certain kind of opinion evidence. One of the questions asked Dr. Kuehner was, “Is the claimant able to go out into the open labor market and compete with other employees?” He replied, “I do not believe she is.” An award cannot be sustained by such testimony. The answer to that question did not require any expert knowledge. Every one knows that no person who has received a serious injury to an organ of his or her body, which is apparent to an employer, is able to go out “into the
 
 open labor market
 
 and
 
 compete”
 
 on equal terms with other employees. It simply cannot be done. The law does not fix that as a basis for an allowance for total disability, nor is it ground for a finding that the injured party is a
 
 nondescript
 
 in the labor market. The use of this misleading question should be discontinued.
 

 There was legally competent evidence that claimant, at the date of the last hearing, had a permanent partial
 
 *251
 
 disability which affected to some extent her earning power in the labor market open to her. If her receipt was founded upon a mistake, this partial disability would be compensable under Section 306(b) and it would become the duty of the compensation authorities to determine the extent of the diminution in her earning power. We are not convinced, however, that there was competent evidence to support a conclusion that the use of her leg had been lost, within the meaning of the statute.
 

 We have concluded from our review of the record that it should be returned to the board under the provisions of Section 427 of the statute, as amended by the Act of June 26, 1919, P. L. 642, 77 PS §877, for specific findings upon the matters indicated in this opinion. First, whether, subsequent to the signing of the receipt, changes, attributable to the injury, occurred in claimant’s physical condition, causing an increase in her disability; or whether there had. been no change in her physical condition. If the disability existing when the petition was filed was a subsequent development, within the contemplation of the second paragraph of Section 413, that would be the end of the case as the petition was not filed within one year after the last payment of compensation under the agreement.
 

 Second, if no change occurred in the condition of claimant’s knee between the date of the receipt and the last hearing, was the receipt founded upon any mistake of fact existing when it was executed?
 

 Third, if founded upon a mistake, what was its nature?
 

 Fourth, had claimant at the time of the hearing, permanently lost the use of her leg for all practical purposes, i. e., for any employment for which she is otherwise mentally and physically qualified; or was her disability merely such a partial disability as is contem
 
 *252
 
 plated by Section 306(b), and if tbe latter, to what extent, if any, has her earning power been reduced?
 

 Judgment reversed and record remitted to the court below to the end that it may be returned to the board for further proceedings not inconsistent with this opinion.